IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SYLVESTER JACKSON,

                Plaintiff,                    OPINION and ORDER

      v.                                              16-cv-542-bbc

P. SCHULZ, CAPT. FOSTER,
CAPT. JENSEN and SGT. GARCIA,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Sylvester Jackson is proceeding pro se in this case on claims that defendants Sergeant Mario Garcia, Captain Casey Jensen, Phil Schulz and Captain Stephen Foster violated his constitutional rights by giving him a conduct report in retaliation for protected speech and then imposing a severe punishment on him and transferring him to a new unit because of his race and protected speech. Now before the court is defendants' motion for summary judgment. Dkt. #34. After reviewing the undisputed evidence and the parties' arguments, I conclude that plaintiff has not submitted sufficient evidence from which a reasonable jury could find in his favor on any of his claims. Therefore, I am granting defendants' motion for summary judgment in full.

      From defendants' proposed findings of fact and plaintiff's responses, I find the following to be material and undisputed.

1

UNDISPUTED FACTS

A. The Parties

At all times relevant to this case, plaintiff Sylvester Jackson was housed at Jackson Correctional Institution, where all of the defendants worked. Defendant Mario Garcia was a correctional sergeant responsible for security on the Melrose Unit during the second shift. Defendant Casey Jensen was a supervising officer 2, also known as a captain, in charge of general security during the second shift. Defendant Stephen Foster was also a captain and was in charge of the Segregation Unit. Foster was assigned to hear most major conduct reports issued at Jackson Correctional in 2010. Defendant Phil Schulz was a unit manager who oversaw operations and programming on the Melrose and Oxbow Units.

B. Plaintiff's Complaints about Defendant Garcia on October 13, 2010

The parties dispute whether plaintiff complained to defendants Schulz and Jensen on October 13, 2010 about defendant Garcia. Plaintiff says that on or about October 13, 2010, he spoke with both Schulz and Jensen about alleged unprofessional and racist behavior exhibited by Garcia. In particular, plaintiff says that he and several other inmates told Schulz and Jensen that Garcia acted unprofessionally and had slammed a black inmate into the wall. Plaintiff did not file a written complaint alleging that Garcia was unprofessional or racist.

Neither Schulz nor Jensen remembers plaintiff complaining that Garcia exhibited unprofessional or racist behavior. Nor do they remember having any discussion with Garcia

about complaints made by plaintiff or any other inmate. Garcia denies that anyone ever told him that plaintiff had made any complaints about him.

### C. October 15, 2010 Incident and Conduct Report

On October 15, 2010, plaintiff went to the dayroom to use the microwave. He brought three packages of soup and intended to heat up water to prepare them. Under institution rules, inmates are permitted to use the dayroom microwave to heat food, but they must remain seated in the dayroom while the microwave is running. Additionally, defendant Garcia sometimes asks inmates to prepare food in their cells before bringing it to the microwave to be heated in order to reduce messes in the dayroom and prevent lines at the microwave.

When plaintiff arrived at the microwave, he began emptying soup packets into a bowl. Defendant Garcia asked plaintiff over the speaker system to report to the officer's station. Garcia then told plaintiff not to prepare food at the microwave. Plaintiff responded that he was not preparing food, he was just making soup. Plaintiff then returned to the microwave and emptied the last soup into his bowl. Garcia called plaintiff again and told him to stop preparing food at the microwave. Plaintiff tried to tell Garcia that he was just heating up water, but Garcia continued to call plaintiff up to the officer station. After Garcia called plaintiff a third time, plaintiff asked Garcia why he was "trying to start an incident" and that Garcia should "leave [him] alone" and "find someone else to pick on." Garcia then told plaintiff he was going to be issued a conduct report and that plaintiff was to return to his

3

room.  Plaintiff told Garcia to "get a life."  Garcia asked plaintiff what he had said, and plaintiff repeated "get a life" to Garcia.  Several other inmates were in the dayroom at the time.  (According to plaintiff, the other inmates questioned why Garcia was picking on plaintiff so much, when plaintiff was not doing anything wrong.  According to Garcia, the other inmates laughed when plaintiff said "get a life.")  Later that day, defendant Garcia issued plaintiff conduct report #2208444 for "disobeying orders," "disrespect" and "disruptive conduct."  Dkt. #37-1.  Those three offenses are known as the "three Ds."

Neither defendant Schulz nor defendant Jensen witnessed the interaction and neither was involved in Garcia's decision to issue a conduct report to plaintiff.  Conduct reports are reviewed by a supervising officer to insure that the written description on the report supports the charge.  It is not the reviewing supervisor's role to investigate the charges or to verify their truthfulness.  As a supervising officer, defendant Jensen may have reviewed the conduct report Garcia drafted, but he does not recall whether he reviewed that particular conduct report.  Nothing on the conduct report itself indicates which supervisor reviewed it.  After a conduct report is reviewed by a supervising officer, it is forwarded to the security director.  The conduct report at issue here was sent to the security director on October 18, 2010.

Under the regulations set forth at Wis. Stat. § DOC 303.68, the security director determines whether the conduct report should be processed as either a "minor offense" or "major offense."  (Some violations are automatically categorized as "major offenses," § 303.71(2), but most are not.)  All violations categorized by the security director or regulation as "major offenses" are scheduled for a disciplinary hearing in front of a hearing officer unless the inmate waives the hearing.  Additionally, if a conduct report is categorized as a "major offense" conduct report, the inmate is removed from his housing unit and placed

4

in temporary lockup status in the segregation unit pending the disciplinary hearing. In this instance, the security director characterized plaintiff's conduct report #2208444 as a "major offense," a disciplinary hearing was scheduled and plaintiff was moved to temporary lockup.

If the security director had characterized plaintiff's conduct report as "minor," defendant Schulz, as the unit manager, would have held an informal meeting with plaintiff and decided what discipline should be imposed on him. However, for major offenses, Schulz is not involved in the disciplinary hearings or in deciding what discipline should be imposed. (According to plaintiff, Schulz has the authority to review "major" conduct reports and reduce them to "minor" conduct reports before they are sent to the security director and has done so for other inmates in the past. Plaintiff cites no admissible evidence to support his contention and Schulz denies that he has this authority. Regardless, there is no evidence that Schulz saw the conduct report at issue here before it was forwarded to the security director or that he had any role in determining whether plaintiff's conduct report would be processed as a major or minor offense.)

D. <u>November 2, 2010 Hearing</u>

Plaintiff received an informal disciplinary hearing on November 2, 2010, at which defendant Foster and Sergeant Sadloske were the hearing officers. Plaintiff submitted a written statement describing his version of events on October 15, 2010. Plaintiff called two inmate witnesses who testified that they had prepared food at the microwave before without incident and that on October 15, plaintiff had only been heating up water for soup. Plaintiff also called defendant Garcia, who testified that plaintiff had not necessarily been doing anything wrong by making soup at the microwave, but that Garcia had decided to write the

5

conduct report after plaintiff refused to stop preparing food when given a direct order and then used disrespectful statements. Plaintiff asked Garcia the following questions:

- At the time of the incident, were you aware of Jackson reporting you to Captain Jensen and the unit manager regarding your harassing and disrespect[ful] conduct, [most recently on] October 12, 2010?

- Are you aware that Jackson reported you grabbing the arm of an inmate without cause to Captain Jensen?

- Are your actions in retaliation for Jackson reporting you?

Garcia answered "no" to each question and Foster refused to let plaintiff call defendants Jensen and Schulz as witnesses. At the conclusion of the hearing, defendant Foster determined that it was more likely than not that plaintiff had committed the misconduct alleged in the conduct report.

Typically, when an inmate is found guilty of the "three D's," he will receive time in the segregation unit as discipline. In this case, defendant Foster took into account plaintiff's lack of prior discipline and ordered that plaintiff be disciplined with 16 days' room confinement with loss of electronic privileges. This meant that any time plaintiff was not at meals, hygiene, work, programming or other approved activities, he was to remain in his room without the use of electronics. This was the lightest disposition possible for a conduct report characterized as a "major" offense. If the disposition had been anything lighter, the offense would have been recharacterized as a "minor" offense. Foster believed it was important that the offense remain characterized as a "major" offense because plaintiff's conduct involved the "three D's," undermined the authority of an officer and occurred before a large audience of inmates.

### E. Plaintiff Is Transferred to a Different Unit

After the hearing, defendant Foster told plaintiff he would be returning to general population. Initially, Foster told plaintiff he would be returning to Melrose Unit and would be able to return to his unit job. However, after conferring with staff on Melrose Unit, Foster told plaintiff that he was being moved to another unit, the Quarry Unit.

Defendant Foster did not make the decision to send plaintiff to the Quarry Unit because Foster does not decide where inmates are housed in general population. That decision is left to the sergeants and unit managers in the general population units. When an inmate returns from temporary lockup, Foster or another correctional officer in the segregation unit notifies a sergeant from the inmate's unit that the inmate is returning. An inmate may be returned to the housing unit he came from or he may be moved to a different unit. (Transfers from one unit to another occur on a regular basis, although the parties dispute how common it is for inmates to be moved to a different housing unit after a release from temporary lockup. Plaintiff says inmates almost always return to their previous units after a temporary stay in segregation, while defendants say it is "somewhat common" for inmates to change units. Defendants do not explain what "somewhat common" means and neither side submitted evidence in the form of statistics to support their proposed facts.) An inmate may be moved to a different unit upon return from temporary lockup to balance the population on each unit or to reduce tension between the inmate and staff members or other inmates on a particular unit.

There are no records of who made the decision to transfer plaintiff from Melrose to Quarry Unit. As the second shift sergeant responsible for the Melrose Unit, defendant Garcia had the authority to transfer an inmate to another unit, but Garcia does not recall

7

ever making a decision to transfer plaintiff to another housing unit. Any of the other correctional sergeants or unit manager working that day also could have made the decision. As a result of plaintiff's transfer to the Quarry Unit, he no longer had his job as a janitor on the Melrose Unit. There were no jobs available for him in the Quarry Unit.

OPINION

Plaintiff is proceeding on the following claims:

(1) defendants Garcia, Jensen and Schulz gave plaintiff a conduct report after plaintiff called Garcia "unprofessional" and a "racist," in violation of plaintiff's right to free speech;

(2) defendant Foster punished plaintiff more severely because of his race, in violation of the equal protection clause; and

(3) after plaintiff was released from segregation, defendants Foster and Garcia violated plaintiff's First Amendment and equal protection rights by transferring plaintiff to a different unit because of his race and because of his protected speech.

I address the parties' arguments with respect to each claim below.

A. Conduct Report

Plaintiff contends that defendants Garcia, Jensen and Schulz gave him a conduct report in retaliation for his complaints about Garcia's racist and unprofessional conduct. As an initial matter, plaintiff has submitted no evidence that Jensen or Schulz was involved in issuing the conduct report or that they were even aware of the conduct report before it was sent to the security director. Although plaintiff speculates that Jensen or Schulz may have known about the conduct report, speculation is not enough. Rockwell Automation, Inc. v.

8

National Union Fire Insurance Co. of Pittsburgh, PA, 544 F.3d 752, 757 (7th Cir. 2008) ("mere speculation or conjecture will not defeat a summary judgment motion"). Additionally, plaintiff contends that Jensen and Schulz should be held responsible for Garcia's conduct because they were supervisors, but a supervisor may be liable under 42 U.S.C. § 1983 only if he or she is "personally responsible for the deprivation of the constitutional right." Chavez v. Illinois State Police, 251 F.3d 612, 651 (7th Cir. 2001). This means that the supervisor must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see[.]" Matthews v. City of East St. Louis, 675 F.3d 703, 708 (7th Cir. 2012). Because plaintiff has no evidence showing that either Jensen or Schulz or both of them were personally responsible for the conduct report, plaintiff's claims against them fail.

With respect to plaintiff's retaliation claim against defendant Garcia, plaintiff must prove three things: (1) he was engaging in activity protected by the Constitution; (2) Garcia's conduct was sufficiently adverse to deter a person of "ordinary firmness" from engaging in the protected activity in the future; and (3) Garcia subjected plaintiff to adverse treatment because of plaintiff's constitutionally protected activity. Gomez v. Randle, 680 F.3d 859, 866-67 (7th Cir. 2012); Bridges v. Gilbert, 557 F.3d 541, 555-56 (7th Cir. 2009). It is not necessary to discuss the first two required showings because plaintiff's claim fails on the third prong, as he has adduced no evidence from which a reasonable jury could find that Garcia acted with a retaliatory purpose when he issued the conduct report to plaintiff.

Plaintiff's sole basis for believing that defendant Garcia had a retaliatory motive is that plaintiff had complained about Garcia's behavior two days before he issued the conduct report to plaintiff. However, although a plaintiff may rely on "[c]ircumstantial proof, such

9

as the timing of events . . . to establish the defendant's retaliatory motive," Massey v. Johnson, 457 F.3d 711, 716-17 (7th Cir. 2006), suspicious timing is almost never sufficient by itself to establish a retaliatory or discriminatory motive. Hobgood v. Illinois Gaming Board, 731 F.3d 635, 644 (7th Cir. 2013).

This is particular true here, where defendant Garcia says he did not even know that plaintiff had complained about him at the time Garcia issued the conduct report. Plaintiff's complaints could not be one of the reasons that Garcia disciplined plaintiff if Garcia did not know about the complaints at the relevant time. Morfin v. City of East Chicago, 349 F.3d 989, 1005 (7th Cir. 2003) ("The protected conduct cannot be proven to motivate retaliation if there is no evidence that the defendants knew of the protected activity."). To the extent that plaintiff believes that Garcia is lying about his lack of knowledge, I see no evidence in the record or even allegations undermining Garcia's testimony. Plaintiff does not allege that he complained to Garcia directly or filed any written complaints about Garcia that Garcia may have seen. Plaintiff alleges that he complained to defendants Schulz and Jensen, but there is no evidence that either of them had any discussions with Garcia about plaintiff's complaints.

For example, plaintiff does not say that Schulz or Jensen told him they would talk to Garcia, that he heard Schulz or Jensen having discussions with Garcia, that Garcia ever mentioned plaintiff's complaints when addressing plaintiff or that Schulz or Jensen ever followed up with plaintiff about his complaints or any conversations they had with Garcia. Instead, plaintiff testified at his deposition that Jensen refused to tell plaintiff whether he had acted on plaintiff's complaints and that Schulz suggested that plaintiff file a written complaint. Plt.'s Dep., dkt. #33, at 49, 52. Thus, presuming any relationship between

plaintiff's complaints and Garcia's conduct report would be entirely speculative.

Additionally, no reasonable jury could conclude that defendant Garcia issued the conduct report in retaliation for plaintiff's speech because plaintiff concedes he engaged in the conduct for which he was written up. Although plaintiff clearly believes that he was doing nothing wrong by opening his soup packets at the microwave and also disagrees with Garcia about whether emptying soup packets into a bowl qualifies as "preparing food," plaintiff concedes that he continued to open the packets despite Garcia's telling him multiple times to prepare his food in his room. He also concedes that he twice told Garcia to "get a life," in front of an audience of inmates. Thus, Garcia's proffered reason for issuing the conduct report is not something he made up later to hide a retaliatory motive. Rather, the evidence shows that Garcia wrote plaintiff a conduct report because he believed plaintiff's behavior was disrespectful, disruptive and disobedient.

Because plaintiff has identified no genuine disputes of material fact that undermine these conclusions, I will grant defendants' motion for summary judgment on plaintiff's claims based on the conduct report.

### B. Defendant Foster's Discipline Decision

Next, plaintiff contends that defendant Foster punished him more severely because of his race, in violation of the equal protection clause. To succeed on his discrimination claim, plaintiff must show that Foster acted with a discriminatory motive and treated plaintiff differently from inmates of different races. Brown v Budz, 398 F.3d 904, 916 (7th Cir. 2005).

Plaintiff has submitted no evidence to support a discrimination claim against

11

defendant Foster. Instead, the evidence shows that Foster gave plaintiff the most lenient punishment possible for a major conduct report. Most inmates who are found guilty of a "three D's" conduct report are punished with segregation, while plaintiff was merely confined to his cell without use of electronics for 16 days.

Plaintiff argues that a white inmate, Nicholas H. Schloff, received a lighter punishment than plaintiff did after telling an officer to "get a life." However, it is undisputed that Schloff was written up by a different sergeant, not defendant Garcia, for two violations of prison rules: disrespect and disruptive conduct. Unlike plaintiff, Schloff was not written up for the "three D's" which would have also included disobeying orders. More significantly, defendant Foster never saw Schloff's conduct report and was not involved in its disposition. Thus, inmate Schloff's punishment is irrelevant to plaintiff's discrimination claim against Foster. Because plaintiff has offered no other evidence to support a claim that Foster discriminated against him on the basis of his race, Foster is entitled to summary judgment on plaintiff's discrimination claim.

### C. Transfer to a Different Unit

Finally, plaintiff contends that defendants Foster and Garcia transferred him from the Melrose Unit to the Quarry Unit because of his race and protected speech. As a result, plaintiff lost his job as a janitor in the Melrose Unit and was never given a replacement job in the Quarry Unit.

Plaintiff's claim against Foster fails at the outset, because plaintiff has no evidence that Foster was involved in the decision to send plaintiff to a different unit. Although plaintiff speculates that Foster could have intervened and recommended that plaintiff remain

in the Melrose Unit, he cites no evidence to support this assertion. Instead, the evidence shows that Foster does not decide where inmates are housed in general population and that such decisions are left to the sergeants and unit managers in the general population units.

This leaves plaintiff's claim against defendant Garcia. Plaintiff contends that Garcia ordered him transferred to a different unit because of plaintiff's race and in retaliation for plaintiff's complaints about Garcia to Schulz and Jensen. Plaintiff points out that just before he was transferred, Garcia had learned about plaintiff's purported complaints during the disciplinary hearing when plaintiff questioned Garcia regarding his knowledge of plaintiff's complaints.

However, plaintiff has produced no evidence that defendant Garcia was involved in the decision to transfer plaintiff to a different unit. Although Garcia had the authority to transfer plaintiff, his was not a sole authority. Any other sergeant or unit manager in the Melrose Unit also had such authority. There is no record of who made the decision to transfer plaintiff or why it was made, and Garcia understandably does not remember whether he made the decision, nearly eight years ago. Thus, plaintiff has provided little basis for a jury to conclude that Garcia was responsible for plaintiff's transfer.

Even if I assume that a jury could infer that defendant Garcia ordered plaintiff's transfer, plaintiff has not submitted enough evidence to prove that Garcia transferred plaintiff in retaliation for plaintiff's complaints to defendants Jensen and Schultz. As with plaintiff's other retaliation claim, plaintiff's only evidence of retaliatory motive is the timing of his transfer. For example, plaintiff has not submitted evidence that Garcia made any statements after learning about plaintiff's purported complaints to suggest that he was

particularly bothered by plaintiff's statements. Nor is there any evidence that Garcia attempted to find out more from Jensen, Schulz or plaintiff himself about the nature of plaintiff's complaints. Instead, it seems likely that Garcia was not concerned about plaintiff's complaints, as neither Jensen nor Schulz had raised plaintiff's concerns with him, despite plaintiff's having made the complaints more than two weeks earlier.

Moreover, defendants submitted evidence that inmates are routinely transferred between units and that it is not uncommon for such transfers to occur after an inmate is released from temporary lock up. Thus, there is nothing suspicious about plaintiff's transfer except for the fact that it occurred after defendant Garcia learned about plaintiff's complaints. Under the circumstances here, as in most cases, the timing alone is not sufficient to create an inference of retaliatory or discriminatory motive. Hobgood, 731 F.3d at 644. Therefore, I will grant defendants' motion for summary judgment on plaintiff's transfer claims as well.

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Sergeant Garcia, Captain Jensen, Captain Foster and P. Schulz, dkt. #34, is GRANTED. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 14th day of June, 2018.

BY THE COURT:
/s/

_____
BARBARA B. CRABB
District Judge